# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MADIE NIXON, LATOYA CONNER, DAVID CONNER, PORTRICE VERNON, as mother of Ariana Conner, formerly a minor, and ARIANA CONNER, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | No. 12 C 00016 <br><br> Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

This is an action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq.*, against the United States by relatives of a deceased employee of the Small Business Administration, alleging that the Government failed properly to maintain and/or transmit a form required to designate the plaintiffs as beneficiaries of the decedent's federal life insurance policy. After the Court denied cross motions for summary judgment, the case proceeded to a two-day bench trial in March 2016, at which the Court heard testimony from the plaintiffs and several witnesses. Here, the Court sets forth its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The Court's factual findings are based on the parties' stipulations, the documentary evidence, and the testimony presented via deposition and at trial, at which the Court had the opportunity to observe and evaluate the credibility of the witnesses. On the basis of the findings of fact and conclusions of law set forth in the discussion below, the Court enters judgment for the Government.

**FACTUAL BACKGROUND**

**I.     FEGLI and the SBA Beneficiary Designation Process**

This litigation concerns the life insurance benefit proceeds from a Federal Employees' Group Life Insurance ("FEGLI") policy obtained by Robert L. Conner. Mr. Conner was an employee in the Chicago office of the United States Small Business Administration ("SBA") from June 1982 until his death on July 15, 2009, due to lung cancer. Stip. Facts ¶ 4, ECF No. 117; Tr. 1 5:4-5.[1] Over the course of approximately the last year of his life, Mr. Connor's health deteriorated; about six months before he died, he moved in with his sister, Madie Nixon, because he needed assistance caring for himself. Tr. 1 4:2-22. He did not, however, disclose that he had lung cancer to his sister until six days before he died. Tr. 1 5:1-5. Ms. Nixon explained that Mr. Connor was "a very, very private person," and other members of his family who testified at trial confirmed that fact. Tr. 1 21:20–22:2; 38:14-25. Ms. Nixon also confirmed that Mr. Connor kept meticulous records. *See* Tr. 1 23:25–24:8. At the time of his death, Conner owned a FEGLI policy in the principal sum of $702,000. Stip. Facts ¶ 15. None of his family members, however, were aware of that fact when he died. *See, e.g.*, Tr. 1 22:20–23:2, 24:18-21, 39:6-13, 48:3-5. This case involves, as a general matter, a dispute about who are the proper beneficiaries of that policy.

The SBA has numerous regional and district offices across the United States, with the Office of Human Capital Management—*i.e.*, human resources—located in Denver, Colorado. Tr. 2 44:24–45:3. The official personnel folders for all employees of the SBA, nationwide, are maintained in the Denver office. Tr. 2 52:2-13. In the time period relevant to this case, Peggy Flores was a human resources specialist in the Denver office responsible for processing employee retirement and death cases; her duties included submitting designation of beneficiary

---

[1] "Tr. 1" refers to the transcript from the first day of the trial, and "Tr. 2" refers to the transcript from the second day of the trial.

forms to the FEGLI program office with respect to employees who died. Stip. Facts ¶ 16; Tr. 2 37:5-7. Ms. Flores testified that SBA employees could give completed designation of beneficiary forms to the administrative officer in their local office to be transmitted to the payroll department in Denver or the employee could send the form directly to the Denver office. Tr. 2 37:20–38:3, 52:19–53:1. Upon receipt of a designation of beneficiary form in the Denver office, members of the payroll department filled out section E, at the bottom of the form, indicating the receiving agency, the date of receipt, the signature of the official, and her title. Tr. 1 94:24–96:1, Tr. 2 37:24–38:3; *see* Def. Ex. E 1-2. The payroll office would then make a copy of the form to send back to the employee at the address listed on the beneficiary form and would file the original in that employee's official personnel folder in the Denver office. Tr. 2 53:8-20. Because the forms went directly to the payroll department, and not to Ms. Flores in the HR department, she would not know whether a specific designation form had been sent to Denver by the SBA employee directly or by the administrative officer in the local office.[2] Tr. 2 38:4-11, 63:10–64:16.

The SBA has a district office in Chicago, which employed approximately 20-30 people between 2007 and 2009. Tr. 1 75:20–76:1. Sheila Bartolomei (formerly Bartolomei-Garcia) has been the administrative officer for the Chicago SBA office since August 1996, and prior to that, was a control clerk and then a support services assistant in the Chicago office for approximately ten years. Tr. 1 52:22–54:5; Stip. Facts ¶ 10. One of the duties of the administrative officer, as delineated in the SBA's description of the position, is to "counsel[ ] employees with respect to health benefits, [and] life insurance." Pl. Ex. G 3, ECF No. 115. Ms. Bartolomei testified that with respect to this particular duty, she helped employees locate various personnel forms online and, if shown a completed form, would review it to make sure the form had been completed

---

[2] When an occasional beneficiary form accidentally came directly to Ms. Flores, she dated the form before handing it over to the payroll department. Tr. 2 64:20-24.

properly.[3] Tr. 1 50:24–51:9, 93:5–94:3. Otherwise, she did not "counsel" employees about life insurance matters, Tr. 1 52:5-11, and Ms. Bartolomei testified that she never "counsel[ed]" Mr. Conner with regards to life insurance. Tr. 52:12-14.

Ms. Bartolomei testified that she sent personnel forms to the Denver office on behalf of an employee only when the employee specifically asked her to do so; for the most part, employees sent their own forms to the Denver office. Tr. 1 56:17-20, 76:15-22. And indeed, the instructions on the backside of the designation of beneficiary form contain a section—"Where should I send this form?"—informing the insured employee that he must send it to his "employing agency," which would then complete section E and return a copy to the individual as evidence of receipt, and that a properly completed designation is not valid unless his employing agency received the form before the employee's death.[4] Ms. Bartolomei did not keep a log or record of what forms she sent to the Denver office on behalf of employees, Tr. 1 56:21–57:11, but she testified that between 1996 and his death in 2009, Mr. Conner never asked her to send a form to Denver on his behalf. Tr. 1 79:15-18. And on all of the designation of beneficiary forms in Mr. Connor's official SBA personnel file (Def. Ex. E), SBA personnel in Denver completed the bottom portion of the form designating the receiving agency; on none of those forms (of which the 2000 form was the most recent) did Ms. Bartolomei or any other employee of the SBA's Chicago office complete the receiving agency portion on behalf of the SBA.

---

[3] Ms. Bartolomei testified that by 2007, these forms were available online, and individual employees were responsible for downloading any forms they required; local offices did not maintain supplies of the printed forms. Tr. 1 93:5-14.

[4] At trial, the plaintiffs objected to this exhibit—a blank version of the designation of beneficiary form—as not previously produced. Tr. 2 75:23–76:9. The Government responded that it produced the exhibit in discovery and as an exhibit to its summary judgment motion. Tr. 2 76:14-15; *see* Gov. R. 56.1 Stat. Facts, Ex. D, ECF No. 82. The Court overruled the objection and admitted the blank form, noting that the date of revision on the 2007 form matches the date of revision on the blank form—April 2001.

Lenore Rodgers has worked in the Chicago office since 1984, first as a loan processing assistant, then as assistant to the district director, and now as a district support assistant. Stip. Facts ¶ 12; Tr. 1 104:2-23. When asked how documents, such as designation of beneficiary forms, got to the HR office in Denver between 2000 and 2009, Ms. Rodgers testified that individual employees faxed their own documents and that she faxed her own documents to Denver in this time frame.[5] Tr. 1 110:8-25. Ms. Rodgers also stated, however, that sometime prior to 2007, Ms. Bartolomei sent a designation of beneficiary form to the Denver office on Ms. Rodgers's behalf. Tr. 1 107:24–108:10. In that instance, Ms. Rodgers gave Ms. Bartolomei the document and asked her to fax it to Denver. Tr. 1 111:25–112:7.

Maria Ramirez was a business opportunity specialist in the Chicago office from January 2000 until January 2012, Stip. Facts ¶ 11, and Robert Conner was her supervisor.[6] Dep. Tr. 9:9-14, ECF No. 119. When asked what the administrative officer would do with a designation of beneficiary form in 2007 if she had possession of the form, Ms. Ramirez testified that she wasn't sure but guessed that the administrative officer would send the form to the personnel office in Denver. Dep. Tr. 13:18-23. Ms. Ramirez testified that her own designation of beneficiary form had been submitted to the Denver office through the administrative officer (presumably, through Ms. Bartolomei, although she did not specify). Dep. Tr. 18:4-23.

The Chicago office also maintained personnel folders for the staff based out of that office. Ms. Bartolomei testified that the folders in the Chicago office were unofficial; they were

---

[5] Ms. Rodgers testified somewhat inconsistently regarding the time period during which Chicago SBA employees faxed their own documents to Denver. After testifying that this was the practice between 2000 and 2009, Rodgers subsequently testified that this had become the practice at some point during that period, but after offering several dates, stated that she could not remember when this change had taken place. Tr. 1 113:2–114:19.

[6] Although Ms. Ramirez was unavailable at the time of the trial, the Court considers her deposition testimony pursuant to Fed. R. Civ. P. 32(a)(4) and Fed. R. Evid. 804(b)(1).

maintained for the convenience of employees, so they had easy access to copies of the official forms they had sent to Denver, and employees managed the contents of their respective folders. Tr. 1 58:20–59:14. Examples of the forms employees kept in these folders include direct deposit forms, W-4s, training certificates, and designations of beneficiary forms. Tr. 1 92:6-12. The folders were located in a locked filing cabinet in Ms. Bartolomei's office (she had the key), and Ms. Bartolomei's office was also locked the majority of the time when she was not present. Tr. 1 58:20–59:9, 59:15–60:5. Ms. Bartolomei testified that to access their folders, the employees had to ask Ms. Bartolomei to unlock the cabinet and retrieve their folder, which they then reviewed at a desk in her office while she was present.[7] Tr. 1 60:15-22, 81:1-23. Employees would add documents to or remove documents from their folders while they were reviewing them in Ms. Bartolomei's office. Tr. 1 82:25–83:4; *see also* Tr. 1 59:11-14 ("The employees put all that in there. The employees were the one to put things in there. . . . I just kept it. That's all.").

With Mr. Conner, Ms. Bartolomei did not follow the standard practice of having the employee review the folder in her office in her presence. Tr. 1 86:18–87:9. Ms. Bartolomei testified that Mr. Conner viewed his folder with increasing frequency in the months leading up to his death in 2009, viewing it every week, two or three times per week. Tr. 1 83:5-10; *see also* Tr. 1 85:24–86:8. Because he spent so much time viewing his folder and because it was apparent that he was very ill, Ms. Bartolomei advised Mr. Conner that he could take his folder to his office to review; he often checked out his folder and returned it a day or so later. Tr. 1 83:11-20, 87:3-9, 87:25–88:11, 89:2-12.

---

[7] It is unclear why employees were required to review these unofficial files in Ms. Bartolomei's office when they were permitted to insert or remove documents from their files.

## II. Robert Conner's FEGLI Forms

On December 15, 2000, Robert Conner signed a designation of beneficiary form ("2000 form") naming his son, Jadonn Harris Conner, as a 40% beneficiary; his daughter, Ariana Portrice Conner, as a 40% beneficiary; and his nephew, D'Angelo Marzell Conner, as a 20% beneficiary. Pl. Ex. B. The form bears the signatures of Sheila Bartolomei-Garcia and James Corbett (an attorney formerly with the SBA) as witnesses. Tr. 1 55:13–56:7. Copies of this form were located in Mr. Conner's unofficial personnel file in the Chicago office and in his official personnel file in the Denver office. Tr. 1 18:25–19:23; *see* Tr. 2 57:7–58:20; Def. Ex. E. Ms. Bartolomei testified that she did not send the 2000 form to the Denver office on Mr. Conner's behalf. Tr. 1 57:12-22.

On April 27, 2007, Mr. Conner completed and signed another designation of beneficiary form ("2007 form"), altering the beneficiaries that had been designated on his 2000 form. The new form reduced the designations for his son, Jadonn and his nephew, D'Angelo, to 21% and 10% respectively; increased the designation percentage for his daughter, Ariana, to 50%; and added as new beneficiaries his niece, Latoya Conner (8%); his sister, Madie Nixon (8%); and his brother, David M. Conner (3%). Pl. Ex. A. The form bears the signatures of Sheila Bartolomei-Garcia and Maria Ramirez as witnesses. Tr. 1 54:13–55:6; *see* Pl. Ex. A. Ms. Bartolomei testified that after she signed the 2007 form, Mr. Connor took the form back. Tr. 1 56:9-16, 78:17-18. She also testified that she did not put the 2007 form into Conner's unofficial personnel file in the Chicago office. Tr. 1 58:11-19. Ms. Ramirez testified that she did not know what Mr. Conner did with the form after she signed it, but that he did not ask her to transmit the form to the Denver office. Dep. Tr. 22:9-15.

After Mr. Conner's death, his son, Jadonn Harris, found copies of both the 2000 and 2007 forms in Mr. Conner's briefcase that he kept in a closet in his sister's home. Tr. 1 4:2-5, 6:4-16, 10:24–11:13, 13:20–14:5. Mr. Conner's sister, Madie Nixon, testified that after she learned of these forms, she called Ms. Flores in the Denver office to inquire about her brother's insurance policy and that, when she informed Ms. Flores that she had a beneficiary form with her name on it, Ms. Flores asked her to fax her the form. Tr. 1 15:18–16:17. On July 22, 2009, Mr. Harris and Ms. Nixon faxed the 2007 form (and an additional designation of beneficiary form for a thrift savings plan, which is not at issue here) to Ms. Flores in the Denver office. Tr. 2 42:2-25; *see* Pl. Ex. D. The version of the 2007 form faxed to Flores was a copy of the page of the form bearing the designation "Part 2 – Duplicate" at the bottom center of the page. *See* Pl. Ex. D; Def. Ex. E. Section E, the portion of the form to be completed by the "Receiving Agency," was blank. Ms. Flores testified that neither this, nor any other version of the 2007 form, was found in Connor's official personnel file maintained in the Denver office. Tr. 2 47:5-8, 61:25–62:9.

At some point thereafter, Mr. Harris went to the Chicago SBA office, where Ms. Bartolomei permitted him to review Mr. Conner's unofficial personnel folder. In the folder, he found a version of the 2007 form, as well as a copy of the 2000 form. Tr. 1 18:25–19:23, 26:23-27:11, 62:9-25. Ms. Nixon testified that Mr. Harris showed her the 2007 form after he had visited the Chicago SBA office and the form appeared to be an "original," Tr. 1 19:18-23, 26:9-11, though she testified previously in a deposition that the documents Harris brought back from the SBA officer were "identical" to the documents found in Connor's briefcase after his death—which all concede were copies. Tr. 1 26:12–27:17.[8] Ms. Bartolomei testified that she made

---

[8] Ms. Nixon explained that in her deposition that in agreeing that the documents were "identical," she was referring not to their physical characteristics as copies or originals but to the information they contained. Tr. 1 28:2-15.

copies of the forms that Mr. Harris requested and gave him the copies and, further, that the documents she copied for him were themselves copies, rather than original documents. Tr. 1 62:15–63:8. The plaintiffs did not offer into evidence any document that Mr. Harris had obtained from the SBA office in Chicago, and Ms. Nixon did not make any further calls to Ms. Flores to advise that the original 2007 designation form had been located in the Chicago SBA office.

Latoya Conner, Mr. Conner's niece, also had a number of phone calls with Ms. Flores after Mr. Conner's death regarding his FEGLI policy. There is some discrepancy in the testimony regarding the substance of the conversations—whether Ms. Flores directed Ms. Conner to MetLife or to Ms. Bartolomei regarding her questions about the policy and the beneficiaries. *Compare* Tr. 2 49:13–51:18 (Ms. Flores testifying she told Ms. Conner to speak with MetLife), *with* Tr. 1 35:2-14, Tr. 2 69:15–70:9 (Ms. Conner testifying that Ms. Flores told her to contact Ms. Bartolomei in the Chicago office).

In August 2009, Ms. Flores forwarded the insurance forms in Mr. Conner's official personnel file to MetLife. She also included the 2007 form, with a note indicating that the SBA HR office did not receive the 2007 form until after Mr. Conner's death. Tr. 2 44:9-21; *see* Pl. Ex. F. MetLife paid Mr. Conner's life insurance benefit proceeds to the beneficiaries listed in the 2000 designation of beneficiary form: 40% to Jadonn Harris, 40% to Arianna Conner, and 20% to D'Angelo Conner. Stip. Facts ¶ 15.

## ANALYSIS

This case arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1), which effects a limited waiver of sovereign immunity for the United States to provide a remedy for personal injury caused by the negligent or wrongful acts of U.S. government employees acting within their scope of employment. In an FTCA action, the government is liable "in the

same manner and to the same extent as a private individual under like circumstances," "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346, 2674. The alleged negligence in this case occurred in Illinois, therefore Illinois law governs this case. *See Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003); *Noble v. United States*, 231 F.3d 352, 356 (7th Cir. 2000). To prevail on an ordinary negligence claim under Illinois law, a plaintiff must prove "the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1053 (Ill. 2006).

Under the FEGLI Act, a signed and witnessed designation of beneficiary form is effective if it is "received before [the insured's] death in the employing office." 5 U.S.C. § 8705(a). This Court addressed the Government's duty with respect to the preservation of completed FEGLI forms in an earlier opinion in this case, concluding that "the Government has a duty under FEGLI and the common law to preserve beneficiary forms submitted by employees in a manner that permits an assessment of the employee's current beneficiaries at time of death." Mem. Op. Denying Mot. Dismiss 12, ECF No. 24.[9] This Court also addressed the definition of the term "employing office" as used in the FEGLI Act, concluding that "the term 'employing office' is broad enough to encompass the office at which Conner worked . . . The form need not have been submitted to the Denver office to become effective." *Id*. 15.[10] Thus, to prevail on their claim for

---

[9] *See also* Mem. Op. Denying Mot. Dismiss 13-14 ("Under the statutory scheme, the employee is responsible for submitting the designation form to the Government; if submitted, it is the Government's concomitant responsibility to maintain the form and to transmit it to the insurer.").

[10] This prior conclusion is now buttressed by evidence that the Government submitted at trial in the form of the blank Designation of Beneficiary form. Def. Ex. D. The instructions on that form advise employees only that they need to submit the form to their "employing agency" and that the "employing agency" must receive the form before the Insured's death. Nothing in

negligence, the plaintiffs must prove by a preponderance of the evidence that Robert Conner submitted the 2007 form to the Chicago office. *See also* Mem. Op. Order Denying Mts. Summ. J. 12, ECF No. 101 ("to implicate this duty (and thereafter establish a breach), Plaintiffs must first show that Conner gave the 2007 beneficiary designation form to the SBA; for if the SBA had no form to preserve, it had no duty to breach."). The Court concludes that the plaintiffs have not met their burden.

It is not disputed that the Denver SBA office never received the 2007 form prior to Mr. Conner's death. The contested issue is whether Mr. Connor ever submitted the 2007 form to Ms. Bartolomei in the Chicago office, thereby triggering a duty on the part of the SBA to preserve that form under the FEGLI Act (which under the SBA's procedures would have required Bartolomei to send the form to the HR office in Denver for processing). The plaintiffs point to evidence that Ms. Bartolomei, as the administrative officer, had a duty to "counsel" employees on life insurance, but Ms. Bartolomei testified without contradiction that she did not counsel employees of the Chicago office about substantive issues pertaining to life insurance. Even if she did, that fact would fall short of establishing that Ms. Bartolomei was responsible for collecting and forwarding to Denver beneficiary designation forms from the employees in the Chicago office.

Unquestionably, Ms. Bartolomei had taken possession of other employees' forms in the past and sent them to the Denver office, but she testified, without contradiction, that she only did so when the employee specifically asked. Ms. Bartolomei's testimony in this regard was corroborated by Ms. Rodgers, who confirmed that on the one occasion on which Ms. Bartolomei had sent a designation of beneficiary form to Denver on her behalf, Ms. Rodgers had given her

---

the instructions even hints that the form must be submitted to a particular department or office of the "employing agency."

the form and asked her to send it. Although Ms. Ramirez testified that the administrative officer (presumably she was referring to Ms. Bartolomei as she worked in the Chicago office) sent her designation of beneficiary form to Denver on her behalf, she was not asked and did not specify whether she gave the administrative officer her form and asked her to send it. Ms. Flores, who worked in the SBA HR department in Denver, did not personally receive the forms and had no way of knowing whether they came directly from an employee or from an administrative officer, so her testimony did not shed any light on office standards with respect to form submission from the Chicago office specifically. She expressly confirmed, however, that as a general matter, although some employees "might" give forms to their local administrative officer to submit on their behalf, others submitted forms directly and that this practice was permitted because some employees preferred to keep the information they were submitting private. Tr. 2 52:19–53:1. Mr. Connor, all agree, was a "very, very private person," so it would not be surprising to find that he had submitted the 2007 form (as well as his earlier beneficiary designation forms) to the SBA's Denver office directly rather than through Ms. Bartolomei or others in the Chicago office.[11]

If anything, the standard practice seemed to be for employees to send their own forms to the Denver office. Ms. Rodgers testified that on all but one occasion between 2000 and 2009, she submitted her own forms to the Denver office. Moreover, the instructions on the backside of the designation of beneficiary form inform the insured employee that he must send the form to his employing agency, which would then complete section E and return a copy as evidence of receipt, and that a properly completed designation is not valid unless his employing agency

---

[11] That said, the Court does not place much weight on this consideration. If Mr. Connor was particularly concerned about keeping his affairs private from Ms. Bartolomei and others in the SBA Chicago office, it seems unlikely that he would have chosen them to witness his beneficiary designation forms.

received the form before the employee's death. Def. Ex. D 4. Thus, the form itself contemplates that an individual employee bears responsibility for submitting his form.

The evidence establishes, then, that Ms. Bartolomei did not routinely receive FEGLI beneficiary designation forms from employees of the Chicago office, but those employees could, if they wished, and occasionally did, submit their beneficiary designation forms to her. So: did Mr. Connor give Ms. Bartolomei the 2007 form to process?

Ms. Bartolomei testified that Mr. Conner did not give her the 2007 form and did not ask her to send that form, or any other form, to Denver on his behalf. The Court finds Ms. Bartolomei's testimony on this point credible. Ms. Bartolomei has no obvious incentive to testify falsely on this point; she has no financial stake in this case and no evidence has been offered to suggest that Ms. Bartolomei, who has worked for the SBA for some 30 years, would be subject to any adverse consequence were it determined that she had neglected to forward Mr. Connor's 2007 form to Denver. Her demeanor while testifying, moreover, was neither defensive nor hostile. Further, there is no contrary testimony or evidence from the only other people involved in Mr. Connor's execution of the 2007 form. So far as the record reflects, Mr. Connor himself never made any statements to anyone about what he did with the 2007 form after signing it, and the only other witness to Mr. Connor's execution of the form, Ms. Ramirez, testified that she did not know what Conner did with the form after she signed it as a witness.

The plaintiffs want the Court to infer that, because the 2007 form was located in Mr. Conner's unofficial personnel folder in the Chicago office, he must have submitted the form to that office, which, as this Court previously held, would trigger Ms. Bartolomei's duty to preserve and forward the form to Denver for processing. Although the folders were locked in Ms. Bartolomei's office, there is no evidence that she filed papers in employees' folders or that she

accessed their folders (other than to retrieve them for the employee to review). Ms. Bartolomei testified that employees managed their own personnel folders and were permitted to add or remove materials from their folders. Thus, the premise of the plaintiffs' argument—that the form could only have been in the Chicago file if Ms. Bartolomei put it there—has not been established. The premise is particularly weak in the context of Mr. Connor's file given Ms. Bartolomei's testimony that, in the months leading up to his death, Mr. Connor wanted access to the file so frequently and for so long that she simply gave him the file to take back to his office to review. Because Mr. Conner had frequent and unsupervised access to his folder and in light of Ms. Bartolomei's undisputed statement that she did not place the 2007 form in Mr. Conner's folder, the Court does not have an adequate basis to infer that Mr. Conner gave the 2007 form to Ms. Bartolomei.

Madie Nixon's testimony that Mr. Harris had the original of the 2007 form with him after visiting SBA—in other words, that there was an original in the SBA Chicago file—is, moreover, expressly contradicted by Ms. Bartolomei, and the Court finds Ms. Bartolomei's testimony on this point to be more credible. If there had been an original of the 2007 form in the Chicago file, it seems quite unlikely that Ms. Bartolomei, upon discovering that fact, would have given that original to Mr. Harris; it is more reasonable to infer that she would have retained that original, either because that was the state of the file as it existed at Mr. Connor's death or (if one credits the plaintiffs' view) to cover up evidence of her failure to process the form as required. In neither case would it have made sense for her to let Mr. Harris take the original, yet that is effectively what Ms. Nixon claimed. Further on this point, if Ms. Nixon had actually seen the original 2007 form, it seems likely that she would have contacted Ms. Flores again in Denver to explain that the she now had the original and that it had been retrieved from the files of the Chicago office;

there is no evidence, however, that she made that call to Ms. Flores or to anyone else at the SBA. Nor did Latoya Connor, who also testified that she made calls to SBA personnel about Connor's beneficiary designation. Nor did the plaintiffs produce the original form that Mr. Harris purportedly presented to Ms. Nixon; even if Mr. Harris retained the form, the plaintiffs never sought to compel its production or to present any testimony from Mr. Harris to support the claim.

Finally on this point, the Court also concludes that it seems exceedingly unlikely that if Mr. Connor had, in fact, submitted the 2007 form to Ms. Bartolomei for processing, and if Ms. Bartolomei had for some reason dropped the ball and neglected to submit the form, that her error would have gone undetected and uncorrected for more than two years. As a threshold matter, there is no evidence in the record to suggest that Ms. Bartolomei was error prone, lacked diligence in the performance of her work, or was otherwise unreliable; there is no evidence that she made similar mistakes on other occasions. But to err is human; even if Ms. Bartolomei put the form in Mr. Connor's file and neglected to forward it to Denver, it seems quite likely (and certainly more likely than not) that Robert Connor himself, who was regularly inspecting his file, would have noted that his original form remained in the Chicago file and that the 2007 form—unlike all of the prior designations he had submitted—had never been "received" by the SBA, as reflected by the blank section E on the form. And even if Mr. Connor didn't catch, or appreciate the problem, it is difficult to believe that Ms. Bartolomei, constantly reminded of Mr. Connor's concern about his personnel forms by his frequent visits to her office, would not have been reminded that she had failed to forward the form to Denver as Mr. Connor had requested her to do. This is not a situation in which it can reasonably be concluded that a form was misfiled and forgotten about; Mr. Connor's preoccupation with his records would, in all likelihood, have

assured that an initial failure by Ms. Bartolomei to submit the beneficiary designation was corrected well before his death.

The plaintiffs have the burden of proof by a preponderance of the evidence. *See Furry v. United States*, 712 F.3d 988, 994 (7th Cir. 2013); *see also NLRB v. Louis A. Weiss Mem'l Hosp.*, 172 F.3d 432, 446 (7th Cir. 1999) ("An absence of evidence does not cut in favor of the one who bears the burden of proof on an issue."). While it is possible that Robert Conner gave Ms. Bartolomei the 2007 form and possible that he asked her to send the form to Denver, the plaintiffs have not provided any evidence that this actually occurred, and the Court not able to infer from the fact that Mr. Conner asked Ms. Bartolomei to witness the form that he necessarily also gave her the form and/or asked her to send it to Denver. The undisputed testimony is that Ms. Bartolomei had not done so for Mr. Conner in the past nor for other employees on a regular basis; thus, there is no basis to infer that this instance differed from prior occasions. Unfortunately, one of the two participants to this interaction—Mr. Conner—is not able to explain what happened after he executed the 2007 form. The only witness who can, Ms. Bartolomei, testified that Mr. Conner did not give her the 2007 form, and for the reasons explained, the Court finds her testimony to be credible.

\*   \*   \*

What did Robert Connor do with his 2007 designation of beneficiary form? That question remains unanswered. On the evidence presented, the Court can only conclude that the plaintiffs have failed to prove by a preponderance of the evidence—*i.e.,* that it is more likely than not—that Mr. Connor submitted the form to Sheila Bartolomei (or anyone else) in the Chicago SBA office for processing. Accordingly, the plaintiffs have failed to establish that the United States

owed, or breached, any duty to process the 2007 form, and judgment will therefore be entered for the United States and against the plaintiffs.

Dated: April 11, 2016

John J. Tharp, Jr.
United States District Judge